# In the United States Court of Federal Claims

No. 16-1633L
(Filed: May 17, 2018)

* * * * * * * * * * * * * * * * * * * *

WILLIAM O. BANKS, et al.,

                 *Plaintiffs*,

v.

THE UNITED STATES,

                 *Defendant*.

Fifth Amendment Taking; Rails-To-Trails; Right-of-Way Easement; Notice of Interim Trail Use; Consent to Do Harm; Fee Estate; State Law Reversionary Interest.

* * * * * * * * * * * * * * * * * * * *

    *Mark Fernlund Hearne, II*, Washington, DC, with whom were *Lindsay S.C. Brinton*, *Meghan S. Largent*, *Stephen S. Davis*, and *Abram Pafford*, for Plaintiffs.

    *Paul George Galindo*, Trial Attorney, United States Department of Justice, Environmental & Natural Resources Division, Washington, DC, with whom was *Jeffrey H. Wood*, Acting Assistant Attorney General, for Defendant.

<u>OPINION</u>

    Plaintiffs in this action are Lafayette County, Missouri landowners who assert that the United States took without compensation interests in their real property contrary to the Fifth Amendment to the Constitution. Plaintiffs allege that their predecessors-in-interest sold right-of-way easements along a 2.91-mile-long strip of land to the Wyandotte, Kansas City and Northwestern Railroad solely for operation of a railway in or about 1873. They allege that the United States, acting pursuant to the National Trails System Act[1] (the

---

[1] In 1983, Congress enacted the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, 97 Stat. 42, to the National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. § 1241 et seq.) (2012). Trails Act creates an an alternative to immediate abandonment

"Trails Act), took a new easement across their underlying fee interest in those same lands in February 2012 when the Surface Transportation Board (STB) invoked section 8(d) of the National Trails System Act and issued a Notice of Interim Trail Use ("NITU"), postponing plaintiffs' immediate right to full use of the surface.

Pending are the parties' cross-motions for partial summary judgment. Plaintiffs' motion seeks a ruling in their favor on liability, after which the court should proceed to the valuation phase. Defendant's cross-motion asks the court to deny plaintiffs' motion and defer ruling on liability. Defendant also seeks a preliminary ruling as to three particular parcels of land, asserting that plaintiffs either do not own the fee, or have waived any objection to the conduct of the United States.

## BACKGROUND

The railroad corridor in question stretches from milepost 246.49 near Myrick, Missouri, to milepost 243.58 in Lexington, Missouri. The Union Pacific Railroad is the most recent successor in interest to the Wyandotte, Kansas City and Northwestern Railroad. On January 31, 2011, Union Pacific petitioned the STB to abandon the line. On February 16, 2012, the City of Lexington requested the STB to invoke section 8(d) of the Trails Act and issue a NITU, which it did on February 24, 2012. In the interim, a series of extensions have been issued to the original NITU, with the most recent expiring on January 24, 2018.

## DISCUSSION

There are fourteen parcels at issue, owned by five plaintiffs. The parties have agreed on a numbering system and, as to most of the parcels, have also agreed that the railroad originally acquired only an easement. As to two parcels, however, defendant contends that the Union Pacific is the fee owner: parcel 13, the Waters conveyance, and Parcel 18, the Macey conveyance. As to the third parcel in dispute, defendant argues that the plaintiff invited the United States' actions, thus waiving any complaint about it now. Plaintiffs

_____

by preserving the rail corridor for future rail use through imposition of an interim recreational trail, a practice known as "railbanking." *See* 16 U.S.C. § 1247(d) (2012).

disagree as to all three.  We address each in turn and then treat the parties' cross-motions as to the general liability issue.

I.  Defendant's Motion For Partial Summary Judgment As To The Three Disputed Parcels

Missouri law permits railroad companies to hold rail corridors in fee. *Miller v. United States*, 67 Fed. Cl. 542, 547 (2005); *Hubbert v. United States*, 58 Fed. Cl 613, 615 (2003); and *Moore v. United States*, 58 Fed. Cl. 134 (2003).  Plaintiffs are correct, however, that Missouri law favors the conveyance of easements to railroads.  *Moore*, 58 Fed. Cl. at 136 (citing *Brown v. Weare*, 152 S.W.2d 649, 652 (Mo. 1941)); *Chouteau v. Mo. Pacific R.R. Co.*, 22 S.W. 458 (1893); *Jordan v. Stallings*, 911 S.W.2d 653, 658 (Mo. Ct. App. 1984).  Thus, only if the intent is clear will a deed be construed as conveying a fee to a railroad for operation of a rail line.

Defendant offers the following printed transcription of the hand-written deed to Parcel 13, the Waters conveyance, parts of which were illegible:

This Indenture made on the 12th day of July A.D. One Thousand, eight hundred and eighty two by and between Patrick Waters and Catherine Waters of Lafayette County, State of Missouri, parties of the first part, and the Missouri Pacific Railway Company Corporation organized under the laws of the State of [illegible], party of the second part. Witnesseth the said parties of the first part, in consideration of the sum of One Hundred dollars, the receipt whereof is hereby acknowledged and the building, maintenance, and operation of a railroad by the said party of the second part its successors and assigns upon the strip of land hereinafter described, do by these presents grant, bargain, and sell, convey and confirm unto the said party of the second part, its successors and assigns, all that piece and parcel of land being a strip of land One hundred and twenty five feet in width situated, being and lying in [… illegible…] State of Missouri in section No. Township No. 51, Range No. 27: Lot 16, Block 2 and Lot 6, Block 3, all in [Illegible] addition to the City of Lexingt[on], Mo. according to the survey and profile map made by the Engineers of said Railway Company for a Railway over and across said tracts of land filed with the Clerk of 54-433 the County Court of said County and in his office

3

being for a sidetrack and switch of said Railway Company. The coal under said land is expressly reserved from the operation of this deed[;] the right is also reserved to remove the fence and the [… illegible…] the same are to be removed so as not to interfere with or delay said Company in constructing their railroad over said lots. And the parties of the first part agree further that the Railway Company aforesaid, through its agents, employees and servants, may be allowed to encroach upon the adjoining Lands outside of the limit above mentioned as to which the parties of the first part [has] title for the purposes of constructing or trimming its cuts or fills or for any purposes of drainage or change of channel, so long as the Railway Company aforesaid may wish to maintain and operate the said Railroad, it being expressly understood and agreed, however, that the title acquired by the said party of the second part shall be confined to the strip of land first above mentioned. To have and to hold the premises aforesaid with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the said party of the second part, and its successors and assigns forever.

We read this language as creating three new estates in land.

The first, relating to the parcel in dispute, we hold to be a fee conveyance. Although the word "fee" does not appear, the granting language contains no limitation of rights in the transfer. Instead, "all that parcel" is bargained, sold and conveyed, subject only to retention of a mineral estate (the coal rights), the second estate created, which, as defendant correctly points out, is not inconsistent with the conveyance of a fee interest. Further, the reference to "the survey and profile map made by the Engineers of said Railway Company for a Railway over and across said tracts of land filed with the Clerk of 54-433 the County Court of said County and in his office being for a sidetrack and switch of said Railway Company," we do not construe grammatically to be a limitation of the purpose of the grant. It is part of the identification of the property.

The consideration of $100 is also not *de minimis*. Indeed, as part of the consideration, the grantee promises to construct a railroad. This additional language, rather than suggesting an easement, is clearly intended as an element of compensation. Finally, the habendum clause is consistent with the

4

conveyance of a fee: "To have and to hold the premises aforesaid with all singular rights the rights privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the said party of the second part, and its successors and assigns forever." All rights in the land, as a surface estate, are being conveyed, in other words, as a fee.

The third estate granted, which relates to "adjoining Lands," appears to be for the limited purpose of allowing the railroad maintenance access in support of the primary grant:

> the Railway Company aforesaid, through its agents, employees and servants, may be allowed to encroach upon the adjoining Lands outside of the limit above mentioned as to which the parties of the first part [has] title for the purposes of constructing or trimming its cuts or fills or for any purposes of drainage or change of channel, so long as the Railway Company aforesaid may wish to maintain and operate the said Railroad, it being expressly understood and agreed, however, that the title acquired by the said party of the second part shall be confined to the strip of land first above mentioned.

This grant, which is limited both in time and purpose, is a grant of an easement for a particular use. It does not, however, suggest a more limited purpose for the identified parcel underlying the railroad track itself. The grants are independent. The first is a fee with a retained mineral estate; the other is an easement.

Parcel 18, the Macey conveyance, is controlled by a quitclaim deed which, according to the government's transcription, recites the following:

> This Indenture, Made on the day of October A.D. One Thousand Eight Hundred and Eighty-Two by and between Henry Macey and Maria Macey of the County of Jackson and State of Missouri, parties of the First Part, and The Missouri Pacific Railway Company of the County of and State of Missouri, party of the Second Part, WITNESSETH: that the said part____ of the First Part, in consideration of the sum of Twenty Dollars [$20.00], to them paid by the said party of the Second Part, the receipt of which is hereby acknowledged, do by these presents Remise, Release and forever Quit-Claim, unto the said party of

5

the Second Part, the following described lots, tracts or parcels of Land, lying, being and situate in the County of Lafayette and State of Missouri, to wit: The right of way for the track and road of said Company one hundred and twenty five feet [125'] in width over and across lots eight (8) and nine (9) in Block Five (5) in Buckingham's addition to the City of Lexington[,] said right of way to be as shown by the profile and map of right of way for additional side tracks of said rail road filed in the office of the County Clerk of Lafayette County Missouri on the 14th day of August 1882.

A quitclaim deed typically transfers all of the grantor's interest in a piece of land, *Jamieson v. Jamieson*, 912 S.W.2d 602, 605 (Mo. Ct. App. 1995) ("A quit-claim deed passes the whole of grantor's interest in the property."), although it does so without warranting title. Plaintiffs are thus left to argue that they have a fee interest in a parcel of land in which their predecessors-in-title quitclaimed away all of their estate. The contradiction in that argument is readily apparent.

We recognized, however, that the use of the following phrase in the granting clause adds a bit of confusion:

The right of way for the track and road of said Company one hundred and twenty five feet [125'] in width over and across lots eight (8) and nine (9) in Block Five (5) in Buckingham's addition to the City of Lexington[,] said right of way to be as shown by the profile and map of right of way for additional side tracks of said rail road filed in the office of the County Clerk of Lafayette County Missouri on the 14th day of August 1882.

Defendant argues that the phrase is purely descriptive of the four corners of the land being conveyed. Grammatically we believe defendant is correct. The right of way language is preceded by the phrase "forever Quitclaim. . . the following described lots, tracts or parcels of Land, . . . to wit: . . ." The court has held that terms such as "'right of way' may be entirely descriptive in nature, rather than an express limitation on the quantum of interest." *Hubbert*, 58 Fed. Cl at 615-616 .

The habbendum clause, while less critical than the granting clause, is also persuasive that the release is of a fee:

> TO HAVE AND TO HOLD the same, with all the rights, immunities, privileges and appurtenances thereto belonging, unto the said party of the Second Part, and its successors and assigns, forever; so that neither the said parties of the First Part, nor their heirs, nor any person or persons for them or in their name or behalf, shall or will hereafter claim or demand any right or title to the aforesaid premises, or any part thereof, but they and every of them shall by these presents be excluded and forever barred.

The language affirms the notion of a quitclaim conveyance. The grantors disclaim any further interest in the parcel, which is contrary to the inherently limited grant of an easement. We are persuaded that this deed conveyed fee title to the land underlying the railway.

Plaintiffs also argue more generally that these two conveyances need be read in light of the broader circumstances surrounding this rail corridor. They point out that the original conveyances to Parcels Nos. 13 and 18 constitute only a fraction of the land abutting and underlying the abandoned railroad corridor owned by William Banks and that the government agrees that at least seven of those original conveyances relating to Bank's property granted easements. They thus urge the court not to treat these two small parcels as distinct.

That may be the case, but each deed must be viewed separately. These are legally operative documents in and of themselves. We cannot reform these two deeds to conform them with the others.

The third parcel of land the government contests is owned by the Lexington Special Road District. Defendant contends that the Road District is barred from recovery because it is a creature of the State of Missouri, and the state consented to the harm that Road District alleges. Both the City of Lexington and the Road District are political subdivisions of Missouri. The Road District is a municipal corporation; the City of Lexington is a municipality, but both derive their powers from Missouri statutes, and the powers of either or both can be expanded, contracted, or amended through the action of the Missouri legislature. According to the government, this plaintiff, properly viewed as the state, has invited the invasion through the actions of one of its other subdivisions. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("[N]o State can be heard to complain about damage inflicted by

its own hand."). Plaintiff responds that these two entities are separately chartered under Missouri law and should be viewed as distinct political entities, each with capacity to complain of the other's actions.

This same issue was addressed recently on similar facts in *Balagna v. United States*, 135 Fed. Cl. 16 (2017). The court there held that because one municipal corporation, the Canton Park District ("CPD"), had sought the NITU at issue, two other landowners which were also municipal corporations could not pursue their claims:

> CPD acted within its statutory authority under Illinois law when it filed the request for public use with the STB. In the Court's view, when CPD filed the public use request with the STB on the state's behalf, the state effectively consented to the federal government holding the City's and Village's properties for use as a trail. Accordingly, no compensable taking occurred.

*Balagna*, 135 Fed. Cl. at 27.

We believe the same reasoning applies here. The "state" here is acting through both the road district and the city. Their conduct thus merges in the State of Missouri. The Road District is barred by the consent of the state, acting through the city, in seeking the federal government's issuance of the NITU.

## II. Plaintiffs' Motion For Partial Summary Judgment And Defendant's Request For A Stay Or Discovery

We turn now to the remaining more general liability issue raised by plaintiffs' motion for summary judgment, which is the mirror image of defendant's motion for a stay. Plaintiffs argue that, under the law of this circuit, liability is established; the incontrovertible act of taking occurred upon issuance of the NITU. Plaintiffs cite *Ladd v. United States,* 630 F.3d 1015, 1019, 1023 (Fed. Cir. 2010), *reh'g and reh'g en banc denied*, 646 F.3d 910 (Fed. Cir. 2011), and *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), for the proposition that a taking occurs immediately upon issuance of a NITU. The fact that a trail easement has not been imposed nor a trail constructed, as is the case here, is not relevant to the issue of liability, according to plaintiffs; consideration of whether a trail is in place merely goes to damages.

That assertion is certainly consistent with the two cited Federal Circuit opinions. *Caldwell's* announcement, at the government's urging, of a bright line rule for commencement of the limitations period, had a dramatic impact on pending rails to trails cases, which had been analyzed under the assumption that a taking did not commence until signing of the trail use agreement. Some cases pending at the time were therefore dismissed as untimely.

Despite its impact on pending cases, thereafter *Caldwell* could be applied coherently in those instances in which a trail user was in place. What that case did not address directly was what would occur if a trail use agreement did not emerge before or during the pendency of litigation. Litigation had to commence, due to *Caldwell*, but the government took the position that the mere issuance of a NITU is not a per se taking.

*Ladd* dealt with the situation in which a trail use agreement was never consummated. Relying on *Caldwell*, the Federal Circuit held that

> we reject the government's present suggestion that the NITU is nothing more than a temporary regulatory hold on the railroad's authority to abandon its railway. In *Caldwell*, we rejected the notion that two takings might occur in a Rails-to-Trails case–a regulatory taking followed by a physical taking. . . . "the accrual date of a single taking remains fixed." We further explained: "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued."

630 F.3d 1015 (citing *Caldwell*, 391 F.3d at 1235). The court made it plain that the taking was a physical, not a regulatory one, and that the duration of the taking went to damages and not to liability. *Id.*

Relying on this controlling precedent, plaintiffs ask the court to enter judgment as to liability. They assert that "the notion of 'permanence' as the government uses the term is not a necessary predicate to establish the landowners' entitlement to compensation." Pl.'s Reply Br. 14, ECF No. 31.

Defendant disagrees, urging the court to delay entry of judgment on liability because of more recent developments in takings law, relying on *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), and the Federal Circuit's decision in *Caquelin v. United States,* 697 Fed. App'x

1016 (Fed. Cir. 2017).

*Arkansas Game & Fish* was not a rails to trails case. Rather, it involved a claim of physical taking due to flooding. At the Court of Federal Claims, Judge Lettow had concluded that the United States was liable for a temporary physical taking and ordered compensation. 87 Fed. Cl. 594 (2009). On appeal, the Federal Circuit reversed. 637 F.3d 1366, 1374 (Fed. Cir. 2011). Because flooding cases have been treated as *sui generis* in takings analysis due to their similarity to tort actions, the court held that, in order to be compensable, flowage easements uniquely had to be permanent or inevitably recurring.[2]  Because there had not been a finding of permanence or inevitable recurrence, there was no taking. *See id*. at 1379.

The Supreme Court reversed. It began by recognizing the background principle in takings law that "[o]rdinarily . . . if government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking." 568 U.S. at 26. The case before it, however, was unique. The question was "the appropriate classification of temporary flooding." *Id.*  The Court went on to make the limited ruling that such cases are not immune from a takings analysis and remanded. In doing so, however, it recognized a more general distinction in takings cases between permanent and temporary physical takings:

> When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is indeed a factor in determining the existence *vel non* of a compensable taking. Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action. So, too, are the character of the land at issue and the owner's "reasonable investment-backed expectations" regarding the land's use. . . . . Severity of the interference figures in the calculus as well.

---

[2] "[C]ases involving flooding and flow-age easements are different. Both Supreme Court precedent and our own precedent dictate that we must distinguish between a tort and a taking." *Arkansas Game & Fish,* 637 F.3d at 1374.

>The Court of Federal Claims found that the flooding the Commission assails was foreseeable. . . . Further, the court determined that the interference with the Commission's property was severe: The Commission had been deprived of the customary use of the Management Area as a forest and wildlife preserve, as the bottomland hardwood forest turned, over time, into a "headwater swamp."

568 U.S. at 38–40 (internal citations and footnotes omitted).

As can be seen from this excerpt, the Court viewed temporary physical takings as similar to regulatory takings in that both involve a balancing of various factors to determine "the existence vel non of a taking." These factors include time, foreseeability, severity, the character of the land at issue and the owner's reasonable expectations.

Subsequent to *Arkansas Game & Fish*, the Federal Circuit was confronted with an appeal from this court's decision in *Caquelin v. United States*, 121 Fed. Cl. 658, 667 (2015), in which Judge Lettow was faced with a situation in which the NITU had never been consummated and indeed had terminated. Nevertheless, relying on *Ladd*, he found that a temporary taking had occurred and ordered compensation. On appeal, that decision was vacated and remanded. 697 F. App'x 1016 (Fed. Cir. 2017). While recognizing that the law of the circuit dictated affirmance by the panel, nevertheless, the circuit court observed that the interposition of *Arkansas Game & Fish* may have called *Ladd* into question. It remanded for the trial court's application of the factors suggested in *Arkansas Game & Fish* for determining when a temporary physical invasion is compensable under the fifth amendment. *Id.* at 1019-20. The court employed a similar remand in *Memmer v. United States*, No. 2017-2150, 2017 WL 6345843 (Fed. Cir. Nov. 16, 2017). Those remands are still pending.

Defendant, in reliance on these remands, urges the court to deny plaintiffs' motion for partial summary judgment and either abide the outcome of *Caqueline* and *Memmer* or allow discovery on the factors identified in *Arkansas Game & Fish.* We believe neither to be necessary.

The Supreme has long held that temporary physical invasions are not necessarily a compensable taking. As the Court taught in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982),

11

The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical invasion is a taking. As *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

The dissent objects that the distinction between a permanent physical occupation and a temporary invasion will not always be clear. This objection is overstated, and in any event is irrelevant to the critical point that a permanent physical occupation is unquestionably a taking. In the antitrust area, similarly, this Court has not declined to apply a per se rule simply because a court must, at the boundary of the rule, apply the rule of reason and engage in a more complex balancing analysis.

*Id.* at 436 n.12.  This is, of course, the same analysis relied on by the Court in *Arkansas Game & Fish.*

We can presume that the court in *Ladd* was familiar with this limitation and nevertheless implicitly concluded that, in the rails to trails context, these factors militated in favor of a compensable temporary taking.  "[P]hysical takings are compensable, even when temporary. . . . The duration of the taking goes to damages, not to whether a compensable taking has occurred."  *Ladd*, 630 F.3d at 1025.  Even if we ignore *Ladd* and undertake a multi-factor analysis, however, the result we find will be the same.

We reject at the outset defendant's remarkable proposal that discovery be allowed into the following myriad questions:

1. The date and circumstances under which plaintiff acquired the property;
2. Plaintiffs' intended use of the property at the time of acquiring the property;
3. Applicable zoning and other rules and restrictions on property

use in the area;

4. Plaintiffs' past and current use of the property;

5. The past and current use of neighboring and nearby properties;

6. The effect, if any, of the rail corridor on plaintiffs' use of the property;

7. The effect, if any, of the NITU and the Trails Act on plaintiffs' use of the property;

8. The economic impact, if any, of the Trails Act on the property;

9. The character of the Plaintiffs' property;

10. Plaintiffs' reasonable investment-backed expectations for their respective properties, if any;

11. The nature and effect of any asserted interference of Plaintiffs' use of their property;

12. The value of the property interest allegedly taken;

13. The amount of compensation due in the event that a temporary taking is established; and

14. The Union Pacific Railroad Company's current property interests in the subject railroad corridor.

These fourteen "factors" are either immaterial to liability or can be addressed without any further discovery. The factors actually enumerated in *Caqueline* or *Arkansas* are the following:

Time: The length of time between the issuance of the NITU and today is undisputed. The NITU was issued on February 12, 2012, and has been extended thereafter. Temporary takings less than six years have been held to be compensable. *See Kimball Laundry Co. v. United States,* 338 U.S. 1 (1949); *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638 (Fed. Cir. 1987); *Hardy v. United States*, 131 Fed. Cl. 534, 540 (2017); *James v. United States*, 130 Fed. Cl. 707 (2017); *Pettro v. United States*, 47 Fed. Cl. 136, 155 (2000).

Causation: There can be no dispute that the NITU occurred and blocked use of the land. As the Federal Circuit explained in *Caldwell*, "[T]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." 391 F.3d at 1233–34. *See United States v. Causby*, 328 U.S. 256, 266 (1946) (affirming a temporary

13

taking from overflights as "a direct and immediate interference with the enjoyment and use of the land").

Intentionality/Foreseeability: We view it as unnecessary to open discovery for this factor as well. There was no inadvertence here. Foreseeability merely inquires into whether the "invasion" is the foreseeable result of government action. *See Arkansas Game & Fish*, 568 U.S. at 39. The compensable "invasion" in a rails to trails case does not necessarily involve physical presence of federal or third party actors. From the beginning, the Court has held that "[b]y deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law." *Preseault v. I.C.C.*, 494 U.S. 1, 8 (1990) (internal citation omitted.) The fact that the NITU is not evidenced by "boots on the ground" is immaterial. The owners of the underlying fee are precluded from using their own land. That result requires no great foresight to anticipate.

Severity/Substantiality: It is undisputed that 100% of the landowners' use of their own land is blocked by operation of law. None of the rails to trails case precedent with respect to liability has required an additional showing by landowners of what they would have done with the land if they could access it. That may well be relevant in a compensation inquiry, but we view it as immaterial on liability.

The character of the land at issue: Admittedly there is no stipulation as to the nature of the land at issue, but we view this issue as immaterial on liability. Whether plaintiffs' property was commercial, farm, or undeveloped land, the United States has no right to simply block control of the surface at no cost to the government unless plaintiffs can demonstrate its value. This issue, as well, only has potential relevance for compensation.

The owner's reasonable investment-backed expectations: In the context of a physical invasion, this issue goes to whether the landowners could legitimately anticipate being free of government interference.[3] For example, if the government is asserting public safety concerns which prompted it to enter the land, then that fact is relevant in a balancing analysis. In *Arkansas*, the Court noted that distinct investment-backed expectations are a matter often

---

[3] We decline to stretch this factor in the context of a rails to trails case to the more generalized inquiry under regulatory takings cases.

informed by the law in force in the State in which the property is located.  568 U.S. at 38.  There can be no need for further consideration here.  The only issue is whether plaintiffs owned a fee estate.  If so, then the entire premise behind *Preseault* is that they have a right under state law to expect the return of unfettered access when a railroad easement comes to an end. There is no assertion that the government was pursuing some public safety concern or was suppressing a nuisance.

Plaintiffs have been deprived of the full use of their own property for over six years.  The NITU plainly caused this impact.  The nature of the taking is foreseeable, severe, not mitigated depending on the quality of the land, and could not be anticipated.  This much is undisputed and is sufficient to find a compensable temporary taking.  Consideration of the other factors are not relevant to liability, although may relate to the amount of compensation.

CONCLUSION

Summary judgment is granted to defendant with respect to the three parcels discussed above.   Claims as to those parcels are dismissed. Defendant's motion is denied in all other respects.  Plaintiffs' motion for partial summary judgment is granted as to liability for a temporary taking with respect to remaining plaintiffs.[4]  The parties are directed to communicate and propose further proceedings with respect to compensation in a joint status report on or before Friday, June 8, 2018.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[4] Defendant alludes to the possibility that some of the plaintiffs, and not merely those who own the three parcels addressed above,  may not have owned their parcels as of the date of the NITU.  The discovery request related only to the multi-factor analysis and presumed no further discovery on title.  Defendant did not seek additional discovery on this issue and has offered nothing other than speculation.